*10cv4691*
*DWF/JJK*

STATE OF MINNESOTA

DISTRICT COURT

COUNTY OF HENNEPIN

FOURTH JUDICIAL DISTRICT

Court File No.:_____

Todd Johnson,

      Plaintiff

vs.

**SUMMONS**

Underwriters Laboratories Inc.
And Linda Zastrow,

      Defendants.

THE STATE OF MINNESOTA TO THE ABOVE-NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED and required to serve upon the attorneys for Plaintiff an Answer to the Complaint which is hereby served upon you within twenty (20) days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

Rule 114 of the Minnesota General Rules of Practice provides for use of alternative dispute resolution ("ADR") in most cases. Notice of ADR processes will be provided by the Court Administrator after this action is filed.

Dated this 3ᵈ day of November 2010

HALUNEN & ASSOCIATES

_Joni M. Thome_

Joni M. Thome, #232087
Matthew S. Nolan, #0390132
80 South Eighth Street
Suite 1650, IDS Center
Minneapolis, MN 55402
Telephone: 612.605.4098

SCANNED

NOV 2 2 2010

U.S. DISTRICT COURT MPLS



EXHIBIT

A

STATE OF MINNESOTA                              DISTRICT COURT

COUNTY OF HENNEPIN                       FOURTH JUDICIAL DISTRICT

---

Court File No.: _____

Todd Johnson,

        Plaintiff,

vs.                                              **COMPLAINT AND**
                                                 **JURY DEMAND**

Underwriters Laboratories Inc.
  and Linda K. Zastrow

        Defendants.

---

The Plaintiff, Todd Johnson, for his Complaint against Defendants, states and alleges as follows:

### PARTIES

1.    Plaintiff resides in the City of Zimmerman, State of Minnesota.

2.    At all relevant times, Plaintiff was employed by Defendant Underwriters Laboratories Inc. ("UL" or "the Company"). UL is a product safety certification organization that conducts business in the City of Minneapolis, County of Hennepin, State of Minnesota.

3.    Defendant Linda K. Zastrow is the Director of Customer Advocacy for UL and was Plaintiff's supervisor at the time of his termination from the Company. Ms. Zastrow resides in the State of Illinois.

### JURISDICTION AND VENUE

4.    This is an action brought to remedy discrimination and sexual harassment based on sex, which resulted in the alteration of the terms and conditions of Plaintiff's employment and to remedy injuries suffered by Plaintiff pursuant to the Minnesota Human Rights Act ("MHRA").

5.     This action further seeks to remedy injuries resulting from common-law assault and battery.

6.     The jurisdiction of this Court is invoked as the violations occurred in the State of Minnesota and involve violations of the MHRA.  Venue is proper as there is no federal question asserted herein and all relevant actions occurred in Hennepin County.

## FACTS

7.     Plaintiff began work with UL on its Retail Team as a Corporate Account Manager on August 25, 2008.

8.     In short time, Plaintiff secured several major accounts for UL, including Target and Best Buy, and was widely praised by his customers, managers and coworkers alike for his great job performance, team management skills and the attention he gave to his clients.

9.     Plaintiff first reported to Robert Roberson, then to Simin Zhou.  Both managers praised his performance.

10.    In December 2009, Plaintiff began reporting to Defendant, Linda Zastrow, who had replaced Simin Zhou as the Director of Customer Advocacy and manager of the Retail Team.  For the first two months, Plaintiff and Zastrow had a good working relationship.  They communicated by phone and email regularly about customer projects and account-related matters, and Plaintiff performed his job duties to Zastrow's satisfaction.

11.    On February 16, 2010, Plaintiff met Zastrow face-to-face for only the second time at the International Consumer Product Health and Safety Organization ("ICPHSO") meeting in Washington D.C.  During that trip, Zastrow approached Plaintiff and began telling him how pretty she thought she was and, while touching her face with the back of her hand, she told him her skin was soft.  She stared at Plaintiff, looking him up and down, and awaited his response.  There was no mistaking that she was flirting with him.  He was stunned and at a loss for words.

2

12.     On March 23, 2010, Plaintiff met Zastrow and other colleagues in Shanghai for meetings with Best Buy. Prior to leaving, Zastrow insisted that she make Plaintiff's hotel arrangements for him, something no other manager or employee had done for him before. It is common practice for employees to make their own travel arrangements through UL's American Express-affiliated travel website. Zastrow placed Plaintiff in her hotel.

13.     On March 24, Plaintiff, Zastrow and others went to lunch and dinner together, and, at each meal, Zastrow made a point of sitting next to Plaintiff. Throughout lunch, she repeatedly and intentionally touched him on the thigh and arms and bumped into him, making him very uncomfortable. During dinner, she talked about certain executives at UL she thought should be fired, including Robert Simmons, who she believed "hasn't accomplished anything," "wasn't worth a shit," and "I can't believe he's been here all these years."

14.     On March 25, Plaintiff went to dinner with Zastrow, Shelly Liu and Alan Ng. This time, Plaintiff made sure he was not sitting right next to Zastrow and, instead sat across from her. During dinner, Zastrow told Plaintiff, again, how soft her skin was and how pretty she looked. She also talked incessantly about LG executives she knew personally who frequently hired prostitutes while on business trips and noted that this was a widely accepted practice. She said that these women would come to meetings she attended and would stay after she left. These comments and her long stares at Plaintiff while she spoke made it clear to Plaintiff that Zastrow was trying to convince him that it was okay to have these affairs while on the road.

15.     Following dinner that night, Zastrow suggested the group go to a bar for more drinks, which they did. At the end of the night, she insisted Ms. Liu pick up the tabs – for what was hundreds of dollars in food and alcohol. As Zastrow had done on other occasions, she said she wanted Liu to pick up the tab since she was the only one who needed to approve the expense incurred by Liu. If she paid the tab on a company account, her manager would have to approve it and he would not likely do so.

3

16. The next day, Zastrow gave individual performance reviews to Ms. Liu, Mr. Ng and Plaintiff. Although Zastrow spent just an hour with Ms. Liu and Mr. Ng, she met with Plaintiff for 3½ to 4 hours, spending much of the time asking about his personal life, including questions about his marital/relationship status and his personal interests. Zastrow also talked about her own marriage. She confessed that she and her husband, Ken – who also works for UL – were having marital problems, in part because of her constant work-related travel. Her sexually suggestive tone, the content of the questions and comments and Zastrow's demeanor made Plaintiff feel physically uncomfortable. She touched him on the arm several times and made a point to sit as close to him as possible throughout the meeting. During a break in the meeting, Plaintiff moved to the other side of the conference table as to not be next to her or physically touched by her. Not until hours into the review did Zastrow finally tell Plaintiff he would be getting a merit raise for his good performance.

17. That evening, Plaintiff dined with Zastrow, Liu and the manager of UL's Shanghai office. Again, Zastrow tried to sit next to Plaintiff, but he moved one chair down once she sat. Over the course of dinner, Zastrow stared lasciviously at Plaintiff. Following dinner, the manager drove Zastrow and Plaintiff to their hotel and dropped them off. Upon entering the hotel, Zastrow asked Plaintiff to have a drink with her at the hotel bar. He declined, feeling distressed and anxious, and bid her goodnight. Following him to the elevator, she grabbed Plaintiff's buttocks and asked if he wanted to go to her room. After telling her no, she pouted her lips in disappointment and watched him until the elevator doors closed. He never saw her again.

18. Plaintiff was completely horrified by the experience and did not sleep at all that night or in the days that followed. In fact, these experiences had so taxed him that he became physically ill with mononucleosis immediately following his trip to Shanghai and had to take time off from work to recover. Zastrow often bragged about her close relationships to CEO Keith Williams – to whom she claimed she reported directly – and Vice President

4

Charlie Abounader. With that in mind, he did not report Zastrow's sexual harassment further out of fear of losing his job.

19.     In the weeks that followed, Zastrow's behavior toward Plaintiff worsened and deteriorated to the point of interfering with his ability to perform his work duties. For example: she rarely responded to his voicemails or emails; she refused to secure him additional money for client-related travel, as she had committed to doing during Plaintiff's performance review; and she failed to provide any feedback to his global account plan proposals submitted pursuant to his performance review. All of these actions by Zastrow adversely affected Plaintiff's ability to service his clients.

20.     On June 22, 2010, without warning, Zastrow and Cheryl Hartman from human resources called Plaintiff and told him he was being terminated due to "restructuring." Plaintiff was shocked as he had never received any indication his job was in jeopardy or that the department was undergoing any significant changes.

21.     Business for Plaintiff and his counterparts was thriving, with no account losses at or near the time of his termination. Programs for Plaintiff's Best Buy and Target accounts were performing particularly well, and he repeatedly received positive feedback from both retailers. Recently, employees were made aware that UL was expanding and had plans to purchase one or more companies in the near future, suggesting that business for UL was good.

22.     Since his termination, Plaintiff learned that neither of his two counterparts has seen any changes to or "restructuring" of their accounts and that their duties remained the same. In fact, UL continued to post an open position for a Global Retail Director to manage the Retail Team, as it has for nearly a year, further demonstrating that it was business as usual in the department.

23.     On the day Plaintiff was terminated, he watched as the CEO spoke to employees via webcast about restructuring that would take place at UL. The CEO assured all employees that no jobs would be lost in the plan. Out of more than 7,000 employees, Plaintiff was one of two terminated despite the CEO's representation.

5

24.     The only other person terminated from the Retail Team had been warned by Zastrow months prior that his position would likely be moved overseas. Zastrow told this employee and human resources that she would attempt to find him alternative employment within the Company if she could not retain him. Plaintiff was not afforded similar treatment, despite the fact his education and job skills make him eligible for a wide variety of jobs. UL did not consider Plaintiff for any of the over 117 jobs that were posted at the time of his termination.

25.     As a direct and proximate result of Defendants' actions and inactions, as herein above alleged, Plaintiff has suffered, and will continue to suffer, loss of income and benefits, humiliation, embarrassment, mental and emotional distress, and other pain and suffering.

## COUNT ONE
## SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT/QUID PRO QUO IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

Plaintiff realleges each and every paragraph of this Complaint.

26.     The conduct of Defendants constitutes discrimination in employment on the basis of sex in violation of Minn. Stat. § 363A.01, *et seq.*

27.     At all times relevant herein, harassing conduct of Defendants towards Plaintiff was based on sex and altered the terms and conditions of Plaintiff's employment, substantially interfered with Plaintiff's employment, and created an intimidating, hostile and offensive working environment for Plaintiff.

28.     Plaintiff's submission to the unwelcome advances of his supervisor was an express or implied condition for receiving job benefits ad/or his refusal to submit resulted in a tangible job detriment.

29.     The harassing conduct of Defendants had the purpose and effect of substantially interfering with Plaintiff's employment; such conduct constitutes sexual

6

harassment and quid pro quo sexual harassment as defined and prohibited by Minn. Stat. § 363A.01, *et seq.*

30. The actionable conduct was committed by Defendants, managers and/or those with actual and apparent authority, and Defendants are therefore liable.

31. Defendants were aware of the sexual harassment, quid pro quo and hostile work environment in which Plaintiff worked but failed to take appropriate action to remedy or prevent the sexual harassment and other unlawful conduct from occurring.

32. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of wages and benefits and other serious damages.

### COUNT TWO
### ASSAULT AND BATTERY

Plaintiff realleges each and every paragraph of this Complaint.

33. In the course and scope of her employment with Defendant UL, Ms. Zastrow harassed and intimidated Plaintiff and led him to believe that his physical safety was in imminent danger. Ms. Zastrow unlawfully touched Plaintiff. This conduct by Ms. Zastrow caused injury to Plaintiff.

34. The aforesaid conduct and acts by Ms. Zastrow, an agent of Defendant UL acting in the scope of her duties, constitute assault and battery against Plaintiff and includes, but is not necessarily limited to, grabbing Plaintiff's buttocks against his will and sexual comments. Said conduct and acts were not welcomed by Plaintiff, were offensive to him, caused him to fear for his personal safety and caused pain and injury to Plaintiff. This conduct constitutes an assault and battery upon Plaintiff.

35. Defendant UL facilitated the aforesaid assault upon Plaintiff by placing Ms. Zastrow in a position of authority and permitting her ready access to Plaintiff.

36. Defendant Zastow is responsible for aforesaid assault and battery as a tortfeasor, and Defendant UL is responsible for the aforesaid assault and battery upon Plaintiff under the doctrine of respondeat superior.

37. As a direct and proximate result of the aforesaid assault and battery, Plaintiff has suffered, and will continue to suffer, humiliation, embarrassment, mental and emotional distress and other pain and suffering.

## COUNT THREE
## REPRISAL DISCRIMINATION
## IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

Plaintiff realleges each and every paragraph of this Complaint.

37. Defendant, through its managers and officials acting on behalf of the Defendant and within the scope of their employment, engaged in unlawful retaliation against Plaintiff in violation of the Minnesota Human Rights Act, Minn. Stat. sec. 363A.01 *et. seq.* after he opposed practices forbidden under the Act.

38. Defendant failed to take all reasonable steps to prevent retaliation against Plaintiff from occurring.

39. The actions of Defendant adversely affected the terms, conditions and privileges of Plaintiff's employment including her termination.

40. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affecting his status as an employee because of his reports and objections.

8

41. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits and other damages.

WHEREFORE, Plaintiff respectfully prays:

a. That the practices of Defendant complained of herein be adjudged decreed, and declared to be a violation of the rights secured to Plaintiff by state law.

b. That Defendant be required to make Plaintiff whole for its adverse, discriminatory actions through restitution in the form of back pay, with interest of an appropriate inflation factor.

c. That a permanent prohibitory injunction be issued prohibiting Defendant from engaging in the practices complained of herein.

d. That Plaintiff be awarded compensatory damages in an amount to be established at trial.

e. That Plaintiff be reinstated to his job or, in the alternative, be awarded front pay and monetary value of any employment benefits he would have been entitled as an employee for Defendant.

f. The Plaintiff be awarded compensatory damages in an amount in excess of $50,000.00 as established at trial.

g. That the Court award Plaintiff his attorney's fees, costs and disbursements pursuant to state and federal statute.

h. That Plaintiff be awarded treble damages as permitted by statute.

i. That the Court grant such other and further as it deems fair and equitable.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS

9

Dated this 3ᵈ day of Noivember, 2010

HALUNEN & ASSOCIATES

Joni M. Thome, #232087
Matthew S. Nolan, #0390132
80 South Eighth Street
Suite 1650, IDS Center
Minneapolis, MN 55402
Telephone: 612.605.4098
*Attorneys for Plaintiff*

## ACKNOWLEDGMENT

     The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney's fees may be awarded pursuant to Minn. Stat. §549.21 to the party against whom the allegations in this pleading are asserted.

Dated this 3ᵈ day of November 2010

                                            Joni M. Thome, #232087

11

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

|  |  |
|---|---|
| Todd Johnson, | Court File No.: _____<br>Case Type: _____ |
| Plaintiff, |  |
| v. | **SUMMONS** |
| Underwriters Laboratories Inc.<br>And Linda Zastrow |  |
| Defendants. |  |

## THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANTS.

1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

2. **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this summons a **written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

    HALUNEN & ASSOCIATES
    1650 IDS Center
    Minneapolis, MN 55402
    612-605-4098

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer with 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint. If you do not want to context the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

HALUNEN & ASSOCIATES

_____                    Dated this 8th day of November 2010
Joni M. Thorne, # 232087
Matthew S. Nolan, # 0390132
1650 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone:  (612) 605-4098

*Attorneys for Plaintiff*

STATE OF MINNESOTA                          DISTRICT COURT

COUNTY OF HENNEPIN                   FOURTH JUDICIAL DISTRICT

---

Todd Johnson,

        Plaintiff,

vs.

Underwriters Laboratories Inc.
and Linda K. Zastrow

        Defendants.

Court File No.: _____

**COMPLAINT AND
JURY DEMAND**

---

The Plaintiff, Todd Johnson, for his Complaint against Defendants, states and alleges as follows:

## PARTIES

1.     Plaintiff resides in the City of Zimmerman, State of Minnesota.

2.     At all relevant times, Plaintiff was employed by Defendant Underwriters Laboratories Inc. ("UL" or "the Company"). UL is a product safety certification organization that conducts business in the City of Minneapolis, County of Hennepin, State of Minnesota.

3.     Defendant Linda K. Zastrow is the Director of Customer Advocacy for UL and was Plaintiff's supervisor at the time of his termination from the Company. Ms. Zastrow resides in the State of Illinois.

## JURISDICTION AND VENUE

4.     This is an action brought to remedy discrimination and sexual harassment based on sex, which resulted in the alteration of the terms and conditions of Plaintiff's employment and to remedy injuries suffered by Plaintiff pursuant to the Minnesota Human Rights Act ("MHRA").

5.      This action further seeks to remedy injuries resulting from common-law assault and battery.

6.      The jurisdiction of this Court is invoked as the violations occurred in the State of Minnesota and involve violations of the MHRA.  Venue is proper as there is no federal question asserted herein and all relevant actions occurred in Hennepin County.

## FACTS

7.      Plaintiff began work with UL on its Retail Team as a Corporate Account Manager on August 25, 2008.

8.      In short time, Plaintiff secured several major accounts for UL, including Target and Best Buy, and was widely praised by his customers, managers and coworkers alike for his great job performance, team management skills and the attention he gave to his clients.

9.      Plaintiff first reported to Robert Roberson, then to Simin Zhou.   Both managers praised his performance.

10.     In December 2009, Plaintiff began reporting to Defendant, Linda Zastrow, who had replaced Simin Zhou as the Director of Customer Advocacy and manager of the Retail Team.  For the first two months, Plaintiff and Zastrow had a good working relationship.  They communicated by phone and email regularly about customer projects and account-related matters, and Plaintiff performed his job duties to Zastrow's satisfaction.

11.     On February 16, 2010, Plaintiff met Zastrow face-to-face for only the second time at the International Consumer Product Health and Safety Organization ("ICPHSO") meeting in Washington D.C.  During that trip, Zastrow approached Plaintiff and began telling him how pretty she thought she was and, while touching her face with the back of her hand, she told him her skin was soft.  She stared at Plaintiff, looking him up and down, and awaited his response.  There was no mistaking that she was flirting with him.  He was stunned and at a loss for words.

2

12.     On March 23, 2010, Plaintiff met Zastrow and other colleagues in Shanghai for meetings with Best Buy.  Prior to leaving, Zastrow insisted that she make Plaintiff's hotel arrangements for him, something no other manager or employee had done for him before.  It is common practice for employees to make their own travel arrangements through UL's American Express-affiliated travel website.  Zastrow placed Plaintiff in her hotel.

13.     On March 24, Plaintiff, Zastrow and others went to lunch and dinner together, and, at each meal, Zastrow made a point of sitting next to Plaintiff.  Throughout lunch, she repeatedly and intentionally touched him on the thigh and arms and bumped into him, making him very uncomfortable.  During dinner, she talked about certain executives at UL she thought should be fired, including Robert Simmons, who she believed "hasn't accomplished anything," "wasn't worth a shit," and "I can't believe he's been here all these years."

14.     On March 25, Plaintiff went to dinner with Zastrow, Shelly Liu and Alan Ng. This time, Plaintiff made sure he was not sitting right next to Zastrow and, instead sat across from her.  During dinner, Zastrow told Plaintiff, again, how soft her skin was and how pretty she looked.  She also talked incessantly about LG executives she knew personally who frequently hired prostitutes while on business trips and noted that this was a widely accepted practice.  She said that these women would come to meetings she attended and would stay after she left.  These comments and her long stares at Plaintiff while she spoke made it clear to Plaintiff that Zastrow was trying to convince him that it was okay to have these affairs while on the road.

15.     Following dinner that night, Zastrow suggested the group go to a bar for more drinks, which they did.  At the end of the night, she insisted Ms. Liu pick up the tabs – for what was hundreds of dollars in food and alcohol.  As Zastrow had done on other occasions, she said she wanted Liu to pick up the tab since she was the only one who needed to approve the expense incurred by Liu.  If she paid the tab on a company account, her manager would have to approve it and he would not likely do so.

3

16.     The next day, Zastrow gave individual performance reviews to Ms. Liu, Mr. Ng and Plaintiff. Although Zastrow spent just an hour with Ms. Liu and Mr. Ng, she met with Plaintiff for 3½ to 4 hours, spending much of the time asking about his personal life, including questions about his marital/relationship status and his personal interests. Zastrow also talked about her own marriage. She confessed that she and her husband, Ken -- who also works for UL -- were having marital problems, in part because of her constant work-related travel. Her sexually suggestive tone, the content of the questions and comments and Zastrow's demeanor made Plaintiff feel physically uncomfortable. She touched him on the arm several times and made a point to sit as close to him as possible throughout the meeting. During a break in the meeting, Plaintiff moved to the other side of the conference table as to not be next to her or physically touched by her. Not until hours into the review did Zastrow finally tell Plaintiff he would be getting a merit raise for his good performance.

17.     That evening, Plaintiff dined with Zastrow, Liu and the manager of UL's Shanghai office. Again, Zastrow tried to sit next to Plaintiff, but he moved one chair down once she sat. Over the course of dinner, Zastrow stared lasciviously at Plaintiff. Following dinner, the manager drove Zastrow and Plaintiff to their hotel and dropped them off. Upon entering the hotel, Zastrow asked Plaintiff to have a drink with her at the hotel bar. He declined, feeling distressed and anxious, and bid her goodnight. Following him to the elevator, she grabbed Plaintiff's buttocks and asked if he wanted to go to her room. After telling her no, she pouted her lips in disappointment and watched him until the elevator doors closed. He never saw her again.

18.     Plaintiff was completely horrified by the experience and did not sleep at all that night or in the days that followed. In fact, these experiences had so taxed him that he became physically ill with mononucleosis immediately following his trip to Shanghai and had to take time off from work to recover. Zastrow often bragged about her close relationships to CEO Keith Williams -- to whom she claimed she reported directly -- and Vice President

4

Charlie Abounader. With that in mind, he did not report Zastrow's sexual harassment further out of fear of losing his job.

19.     In the weeks that followed, Zastrow's behavior toward Plaintiff worsened and deteriorated to the point of interfering with his ability to perform his work duties. For example: she rarely responded to his voicemails or emails; she refused to secure him additional money for client-related travel, as she had committed to doing during Plaintiff's performance review; and she failed to provide any feedback to his global account plan proposals submitted pursuant to his performance review. All of these actions by Zastrow adversely affected Plaintiff's ability to service his clients.

20.     On June 22, 2010, without warning, Zastrow and Cheryl Hartman from human resources called Plaintiff and told him he was being terminated due to "restructuring." Plaintiff was shocked as he had never received any indication his job was in jeopardy or that the department was undergoing any significant changes.

21.     Business for Plaintiff and his counterparts was thriving, with no account losses at or near the time of his termination. Programs for Plaintiff's Best Buy and Target accounts were performing particularly well, and he repeatedly received positive feedback from both retailers. Recently, employees were made aware that UL was expanding and had plans to purchase one or more companies in the near future, suggesting that business for UL was good.

22.     Since his termination, Plaintiff learned that neither of his two counterparts has seen any changes to or "restructuring" of their accounts and that their duties remained the same. In fact, UL continued to post an open position for a Global Retail Director to manage the Retail Team, as it has for nearly a year, further demonstrating that it was business as usual in the department.

23.     On the day Plaintiff was terminated, he watched as the CEO spoke to employees via webcast about restructuring that would take place at UL. The CEO assured all employees that no jobs would be lost in the plan. Out of more than 7,000 employees, Plaintiff was one of two terminated despite the CEO's representation.

24.     The only other person terminated from the Retail Team had been warned by Zastrow months prior that his position would likely be moved overseas. Zastrow told this employee and human resources that she would attempt to find him alternative employment within the Company if she could not retain him. Plaintiff was not afforded similar treatment, despite the fact his education and job skills make him eligible for a wide variety of jobs. UL did not consider Plaintiff for any of the over 117 jobs that were posted at the time of his termination.

25.     As a direct and proximate result of Defendants' actions and inactions, as herein above alleged, Plaintiff has suffered, and will continue to suffer, loss of income and benefits, humiliation, embarrassment, mental and emotional distress, and other pain and suffering.

### COUNT ONE
### SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT/QUID PRO QUO IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

Plaintiff realleges each and every paragraph of this Complaint.

26.     The conduct of Defendants constitutes discrimination in employment on the basis of sex in violation of Minn. Stat. § 363A.01, *et seq.*

27.     At all times relevant herein, harassing conduct of Defendants towards Plaintiff was based on sex and altered the terms and conditions of Plaintiff's employment, substantially interfered with Plaintiff's employment, and created an intimidating, hostile and offensive working environment for Plaintiff.

28.     Plaintiff's submission to the unwelcome advances of his supervisor was an express or implied condition for receiving job benefits ad/or his refusal to submit resulted in a tangible job detriment.

29.     The harassing conduct of Defendants had the purpose and effect of substantially interfering with Plaintiff's employment; such conduct constitutes sexual

harassment and quid pro quo sexual harassment as defined and prohibited by Minn. Stat. § 363A.01, *et seq.*

30.　　The actionable conduct was committed by Defendants, managers and/or those with actual and apparent authority, and Defendants are therefore liable.

31.　　Defendants were aware of the sexual harassment, quid pro quo and hostile work environment in which Plaintiff worked but failed to take appropriate action to remedy or prevent the sexual harassment and other unlawful conduct from occurring.

32.　　As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of wages and benefits and other serious damages.

## COUNT TWO
### ASSAULT AND BATTERY

Plaintiff realleges each and every paragraph of this Complaint.

33.　　In the course and scope of her employment with Defendant UL, Ms. Zastrow harassed and intimidated Plaintiff and led him to believe that his physical safety was in imminent danger. Ms. Zastrow unlawfully touched Plaintiff. This conduct by Ms. Zastrow caused injury to Plaintiff.

34.　　The aforesaid conduct and acts by Ms. Zastrow, an agent of Defendant UL acting in the scope of her duties, constitute assault and battery against Plaintiff and includes, but is not necessarily limited to, grabbing Plaintiff's buttocks against his will and sexual comments. Said conduct and acts were not welcomed by Plaintiff, were offensive to him, caused him to fear for his personal safety and caused pain and injury to Plaintiff. This conduct constitutes an assault and battery upon Plaintiff.

35.    Defendant UL facilitated the aforesaid assault upon Plaintiff by placing Ms. Zastrow in a position of authority and permitting her ready access to Plaintiff.

36.    Defendant Zastow is responsible for aforesaid assault and battery as a tortfeasor, and Defendant UL is responsible for the aforesaid assault and battery upon Plaintiff under the doctrine of respondeat superior.

37.    As a direct and proximate result of the aforesaid assault and battery, Plaintiff has suffered, and will continue to suffer, humiliation, embarrassment, mental and emotional distress and other pain and suffering.

**COUNT THREE**
**REPRISAL DISCRIMINATION**
**IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT**

Plaintiff realleges each and every paragraph of this Complaint.

37.    Defendant, through its managers and officials acting on behalf of the Defendant and within the scope of their employment, engaged in unlawful retaliation against Plaintiff in violation of the Minnesota Human Rights Act, Minn. Stat. sec. 363A.01 *et. seq.* after he opposed practices forbidden under the Act.

38.    Defendant failed to take all reasonable steps to prevent retaliation against Plaintiff from occurring.

39.    The actions of Defendant adversely affected the terms, conditions and privileges of Plaintiff's employment including her termination.

40.    The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affecting his status as an employee because of his reports and objections.

8

41.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits and other damages.

WHEREFORE, Plaintiff respectfully prays:

a.      That the practices of Defendant complained of herein be adjudged decreed, and declared to be a violation of the rights secured to Plaintiff by state law.

b.      That Defendant be required to make Plaintiff whole for its adverse, discriminatory actions through restitution in the form of back pay, with interest of an appropriate inflation factor.

c.      That a permanent prohibitory injunction be issued prohibiting Defendant from engaging in the practices complained of herein.

d.      That Plaintiff be awarded compensatory damages in an amount to be established at trial.

e.      That Plaintiff be reinstated to his job or, in the alternative, be awarded front pay and monetary value of any employment benefits he would have been entitled as an employee for Defendant.

f.      The Plaintiff be awarded compensatory damages in an amount in excess of $50,000.00 as established at trial.

g.      That the Court award Plaintiff his attorney's fees, costs and disbursements pursuant to state and federal statute.

h.      That Plaintiff be awarded treble damages as permitted by statute.

i.      That the Court grant such other and further as it deems fair and equitable.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS

9

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney's fees may be awarded pursuant to Minn. Stat. §549.21 to the party against whom the allegations in this pleading are asserted.

Dated this 8th day of November 2010

Joni M. Thorne, #232087

11